## Frank's Administrator v. Bates.

(Decided June 12, 1936.)

WARD YAGER and R. L. VINCENT, F. A. HARRISON, and A. M SAMUELS for appellant.

H. B. ALEXANDER and L. M. ACKMAN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On March 20, 1933, James T. Frank, a farmer residing in Grant county, died testate, his will having been executed on December 13, 1926. It will therefore be seen that he lived 6 years, 3 months, and 7 days after its execution, and during that time he continued to transact business, drove his automobile, and traded and

trafficked in real estate as well as personalty. By his will he devised all of his property, consisting of some personalty and two farms, to his wife, Carrie Frank, and designated her as executrix thereof without bond. After his death, and on April 10, 1933, the will was pro-' bated in the Grant county court, but Mrs. Frank, on account of her age and health, was disinclined to assume the responsibility of executrix of her husband's estate and requested his brother (Newt Bates), or her and her husband's daughter (who was their only child), the appellee, Sallie Bates, to qualify as personal representative with the will annexed, which was followed by the appointment of Mrs. Bates to that fiduciary position. She qualified and assumed the responsibility and continued to act as such until July 5, 1934, on which date she made her last settlement and tendered her resignation, followed by her prosecuting, on the same day, an appeal from the Grant county court to the Grant circuit court from the judgment probating her father's will. The grounds of contest, as alleged by her, were that when he executed it he was mentally incapacitated to do so and that he was unduly influenced in making it. Her right in the circumstances to so change and alter her position and to contest the will of her father which she had sworn to execute, and in which duty she engaged for more than a year, was appropriately contested, but the court disallowed that defense, to which appropriate objections and exceptions were made by contestees in the circuit court. The grounds were then controverted and tried before a jury, resulting in a verdict finding the testator mentally incapacitated to execute the will, and judgment was entered accordingly. The motion for a new trial made by contestees was overruled, and they prosecute this appeal.

Many grounds were relied on in the motion for a new trial, the most, if not all, of which are also argued on this appeal; but for reasons stated below it will not be necessary to determine any of them, except the one disputing the right of the daughter of testator to prosecute the contest in the circumstances outlined. However, it might not be amiss to say that many of the other grounds are meritorious; particularly the one relying on the admission of incompetent evidence introduced by the contestant over the objections of contestees. Much of that testimony is rank hearsay, and a most prejudicial

item of it was the introduction of the will of the widow (Carrie Frank), the sole devisee in the will of her deceased husband, James T. Frank. She, on April 24, 1934, executed her will, in which she disposed of all of her estate, including that devised to her by her husband, and died on May 16 thereafter, 17 days after her will was executed. It was soon probated in the same county court and by it she devised a portion of her property, including one of the farms devised to her by her husband and upon which they resided, consisting of 138 acres, to Whit Jump, a stranger in blood to both her and her husband, and the remainder of her property, after the payment of debts, was devised to the infant daughter of contestant, Sallie Bates, she being the granddaughter of testatrix, but her daughter, the contestant, received nothing under her mother's will.

The record shows that the contestant was first made aware of the existence of her mother's will after the latter's death and which, as we have stated, was followed by her resignation as administratrix with the will annexed of her deceased father. The court permitted, over the objections of contestees, the introduction of the will of Carrie Frank and also testimony showing the relationship with Whit Jump to Mr. and Mrs. Frank for the last preceding 25 years or more. Mrs. Frank stated in her will why she made the devise to Whit Jump and which was couched in this language: "The reason I do this is that my husband requested me to give the farm to Whit Jump, and because he assisted my husband and myself for thirty-three years and was always ready to help us." Clearly neither the execution nor the contents of the will of Carrie Frank had any legitimate bearing upon the condition of mind of James T. Frank back in 1926 when he executed his will, and the evident purpose in the introduction of that testimony was to poison the minds of the jury against upholding the will of James T. Frank vesting in his widow the absolute title to his property and a part of which she later devised to the stranger, Whit Jump. The record does not disclose an unnatural reason for the husband to make the request which the widow recited in her will, nor any reason why she should not carry out that request; but we will not attempt to recite or discuss any of the testimony supporting that statement for the manifest reason that it is entirely nonessential in view of the conclusions we

have reached with reference to the right of Sallie Bates, the only descendant (immediate or remote) of James T. Frank and Carrie Frank, to prosecute the contest.

Before taking up that issue for disposition, we deem it pertinent to state that on August 31, 1933, there was a written contract entered into between the widow, Carrie Frank, and her daughter, the contestant, Sallie Bates, whereby the mother in consideration of her daughter moving out of the residence occupied by the former (into which she had moved after her father's death) agreed to turn over her two farms that had been devised to her by her husband, and for the daughter to have exclusive management of both, but agreeing to furnish to her mother ''a sufficient fund to properly maintain the first party herein'' (Carrie Frank) and to devote the balance of the net earnings to the payment of certain debts of the testator. The mother therein agreed to not sell either of the farms and to preserve them intact ''to descend to the second party herein or her heirs.'' It was also incorporated in that contract that the daughter should furnish funds with which to employ ''the attendance of some woman to be with her [Carrie Frank] night and day if said first party deems same necessary.'' There was nothing in that contract stipulating as to what should become of the income from the two farms after the payment of the debts of James T. Frank over and above what might be necessary to comply with its terms with reference to the support and maintenance of Carrie Frank. We presume that in that event it would be the right of Sallie Bates to appropriate such excess, if any, to her own use. But whatever might be the true interpretation of the contract in that respect, the essential fact is that it was a recognition on the part of Sallie Bates that her mother was the true and lawful owner of the two farms furnishing its subject matter, and which contract might never have been entered into by Carrie Frank if she had accepted her dower and distributable portion of the estate of her husband in case of his death intestate, which would be the condition if his will should be set aside. We turn now to what we conclude is a decisive question in the case; i. e., the right of Sallie Bates to contest her father's will in the narrated circumstances, none of which are disputed, but all of which are admitted.

At the outset it will be observed that the question of

a legatee or devisee being estopped to contest a will, *after* accepting benefits conferred upon him thereby, is not involved. There is some contrariety among the opinions of the various courts as to the effect of such a state of facts, but this court has quite consistently said that in such circumstances the beneficiary under the will would be estopped to contest it after he had received his benefits, and especially so when he had knowledge of all the facts at the time of acceptance. The point here is essentially one of *election* by one who possessed knowledge of all the facts at the time she exercised her choice of courses that she would pursue with reference to the involved will. Seldom has the question been considered by the courts—so much so that we were more or less astonished when we came to investigate it. The text in 68 C. J. 934, in treating the exact question, says: ''The *mere fact* that the contestant is a qualified executor of the will he is attacking does not estop him, his right of action in such case not being affected by his subsequent resignation and discharge as executor; but an executor who becomes such *with knowledge* of the facts is estopped thereafter to contest the will. * * *'' (Our italics.)

In support of the first part of that excerpt are cited the two cases of Gaither v. Gaither, 23 Ga. 521, and Molander v. Anderson, 214 Ill. App. 446. They sustain the text on that proposition, i. e., that the *mere fact* that the contestant is a qualified executor of the will he is attacking does not estop him''; but the latter portion of the excerpt brings into the picture an additional fact and which is, that a different consequence will follow when the executor *at the time* he accepts his appointment and qualifies has *full knowledge* of the facts with reference to the execution of the will which he takes an oath to execute, and elects to treat it as valid and to waive his right to contest its validity. By so acting he makes an election which he will not later be permitted to renounce and to adopt and pursue a directly contrary course. The chief authority for that position is the case of Langhirt v. Hicks, 153 Md. 31, 137 A. 482. The direct question, unmodified by any qualifying facts, was presented to the court in that case and it held that an heir possessing such knowledge *at the time* he was appointed to and accepted the responsibility of executing the will of his testator would not be allowed thereafter to repudiate his election and be permitted to contest the

validity of the will, based on facts known to him at the time of his appointment and qualification.

In support of that conclusion the court quoted with approval the text of Bigelow on Estoppel (6th Ed.) p. 732, saying: "A party cannot either in the course of litigation or in dealing in pais occupy inconsistent positions. Upon that rule election is founded; 'a man shall not be allowed,' in the language of the Scotch law, 'to approbate and reprobate.' And where a man has an election between several inconsistent courses of action, he will be confined to that which he first adopts; the election, if made with knowledge of the facts, is in itself binding,—it cannot be withdrawn without due consent; it cannot be withdrawn though it has not been acted upon by another by any change of position. [Latin maxims.] The phases in which this doctrine is presented are extremely various." The author then proceeds to enumerate and discuss the variety of circumstances creating such an election, and the estopping effects thereof, and supports the conclusions contained in the excerpt, citing many cases from numerous distinct jurisdictions.

That doctrine would, of course, not apply and could not be invoked when the one making the election possessed no knowledge of the facts at the time, since in that case an obligatory choice on his part could not be made because of his ignorance of the facts, and which was the question before the Georgia and Illinois courts in the cases cited, supra, from those jurisdictions. The contestant in this action was not only present when her father executed his will and raised no objections, but she was likewise present when the will was probated and consented to execute it, and she also knew *every* fact at those two separate dates that she testified to at the trial of this case with reference to the condition of her father's mind, and the circumstances under which he executed his will.

The opinion in the Maryland case, supra, as does the text of Mr. Bigelow, confirms the principle now under consideration, not so much on a technical unqualified estoppel, as ordinarily comprehended, but upon the doctrine of election, which, if made under a knowledge of the facts, the one making it will be estopped to later renounce and seek to profit by adopting the reverse course, as bottomed upon the same facts of which he

then knew. That reasoning suggests itself to our minds as being sound. It is not only approved by the eminent text-writer, to which we have referred, but also by a court occupying a high position in the judicial tribunals of this country. More than that, it accords with the fundamental principles of honor and uprightness and refuses to reward inconsistency and insincerity—two noble virtues in human nature which just and upright men have never ceased to laud. One of them whose identity is unknown said: "Consistency, thou art a jewel"; and another one, an ancient Chinese philosopher (Confucius), said: "Sincerity and truth are the basis of every virtue." It may be true that it is no part of the duty of civil courts to enforce compliance with either of those virtues, but they may refuse to reward or confer profit upon one because of his renunciation of them, and especially, as in this case, where the one so renouncing has dealt with another upon the hypothesis that the position first assumed was final, as was done by the contestant when she entered into the contract referred to with her mother. Being so convinced, because of the authorities and the reasons advanced, it follows that a more extended discussion would be superfluous, and it likewise becomes unnecessary to base the reversal on any of the other grounds relied on for that purpose.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and to sustain the motion of appellants for a new trial, and for proceedings consistent herewith.